## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| ALFRED SEWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-988-SLR |
| | ) |
| HERTRICH INVESTMENTS, LTD | ) |
| d/b/a Hertrich's Capitol, | ) |
| | ) |
| Defendants. | ) |

Noel E. Primos, Esquire, William D. Fletcher, Jr., Esquire, and B. Brian Brittingham, Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware. Counsel for Plaintiff.

David G. Culley, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware. Counsel for Defendant.

## **MEMORANDUM OPINION**

Dated: November 10, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On December 23, 2009, Alfred Sewell ("plaintiff") filed an employment discrimination complaint against his former employer, Hertrich Investments, LTD ("defendant"). (D.I. 1) The amended complaint set forth three counts: (1) discrimination on the basis of race and national origin in violation of Title VII, 42 U.S.C. § 2000(e) et seq. ("Title VII"); (2) discrimination on the basis of a hearing disability in violation of Title IV of the Americans With Disabilities Act, 42 U.S.C. 12112(a) ("ADA"); and (3) retaliation in violation of Title VII. (*Id.*) By stipulation of the parties, an amended complaint was filed on May 28, 2010. (D.I. 13) The amended complaint contained an additional count: discrimination based upon a hostile work environment in violation of 42 U.S.C. § 1891 ("§ 1891"). (*Id.*) Defendant filed a motion to dismiss the retaliation claim. (D.I. 5) That motion was granted. (D.I. 16) Presently before the court is defendant's motion for summary judgment on the remaining three counts. (D.I. 53) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed below, the court grants in part and denies in part the pending motion.

## II. BACKGROUND

Plaintiff is a fifty-five year-old Jamaican man who immigrated to the United States in the 1970s. (D.I. 56 at 3) Plaintiff suffers from a hearing disability and this disability requires him to wear hearing aides in both ears. (*Id.* at 24-25) Plaintiff's hearing loss began in the late 1970s or early 1980s, and plaintiff has been wearing hearing aides since the 1990s. (*Id.*)

Plaintiff settled in Delaware in 1994 (*id.* at 3) and was hired by defendant in

November of 2007 (id. at 29). Defendant is a car dealership, and plaintiff was hired for the position of car detailer. (Id.) The parties disagree about who interviewed and ultimately hired plaintiff for the detailer position. According to defendant, plaintiff interviewed first with Jim Baaden, the administrative assistant to general manager Guy Winer ("Winer") (id. at 30-32; 99) and then interviewed with Darryl Baldwin ("Baldwin"), the manager of the detail department (id. at 32; 99; 146). Defendant contends that plaintiff also interviewed with Winer, who, as the general manager, interviewed and approved all new hires, including plaintiff. (Id. at 100-01) Plaintiff denies being interviewed by Winer. (Id. at 32-33) The parties agree that at the time of his hire, plaintiff's Jamaican heritage and hearing disability were known to defendant. (D.I. 54 at 3; D.I. 59 at 3)

As an employee in the detail department, plaintiff reported directly to Baldwin, an African-American male. (D.I 56 at 34) Baldwin oversaw four other detailers besides plaintiff; these other detailers were Wayne Morris (African-American male), Greg Mason (African-American male), Brian Nichols (Caucasian male) and Antonio Williams (African-American male). (Id. at 42; 103-06)

Plaintiff claims Baldwin began overtly harassing him about his nationality and hearing disability in April of 2008. (D.I. 60 at 30) According to plaintiff, when he would arrive in the mornings, Baldwin would come up behind him and try to see if he could hear him say "Alfred, Alfred, Alfred, you fucking Jamaican monkey." (Id. at 31) While plaintiff acknowledges that this harassment did not occur every morning, plaintiff claims that it was a fairly regular occurrence. (Id.) Besides calling him a "Jamaican monkey,"

2

plaintiff also alleges that Baldwin would call him "an asshole" and would tell him to "turn up [his] hearing aid." (*Id.* at 31-32) Plaintiff also testified that Baldwin put him in a headlock during one altercation, and his hearing aid broke during this scuffle. (*Id.* at 34) Plaintiff testified that this harassment made him "feel uncomfortable." (*Id.* at 31)

Despite the alleged regularity of the harassment and his discomfort, plaintiff admits not reporting Baldwin's harassing behavior to one of Baldwin's superiors or anyone else in management. (D.I. 56 at 56-58) Plaintiff explains that he did not report the harassment because he was not sure anyone would believe his allegations and he was also afraid he would lose his job if he filed a report. (*Id.* at 52-59) He also testified that Baldwin threatened to have him fired if he said anything to management about the alleged harassment. (*Id.* at 57) Plaintiff did discuss the harassment with his fellow detailers and his ex-wife. (D.I. 56 at 52-59; D.I. 60 at 57-58)

Aside from Baldwin's alleged harassment, plaintiff also claims that Winer harassed him on the basis of his nationality and hearing disability. According to plaintiff, he and some of his co-workers were tasked with helping Winer move some items around the dealership. During this time, plaintiff claims that Winer stated that "Jamaica[n] people don't like white people." (D.I 56 at 61) Winer also supposedly told plaintiff to "turn it up, turn it up," in reference to his hearing aid. (*Id.* at 62) With respect to the latter comment, plaintiff thinks it was made during his first interaction with Winer and, while he believes the remark may have been a joke, he did not find it funny. (*Id.* at 65-67)

3

In either late May or early June, plaintiff was given a $1/hour raise by Winer. (*Id.* 39) The raise came in response to plaintiff's requests for a pay increase. (*Id.*) Shortly after receiving the raise, on June 17, 2008, plaintiff was terminated for allegedly stealing gasoline for personal use. The parties dispute the justification for and manner in which the termination occurred.

According to defendant, on June 16, 2008, one of defendant's employees backed a vehicle into a customer's car, causing damage to the customer's vehicle. (*Id.* at 111-12) Because no one admitted to causing the damage, Winer accessed security camera footage to see if he could identify a culprit. (*Id.*) While reviewing the footage, Winer claims he observed plaintiff aid Wayne Morris ("Morris") in his effort to steal gasoline from the dealership's gasoline pump. Specifically, Winer claims to have seen plaintiff act as a lookout for Morris while Morris filled his personal vehicle with gasoline. (*Id.* at 112; 119) Winer also testified that plaintiff filled up a gas canister at the dealership's pump and eventually put this gasoline into his personal vehicle.[1] (*Id.* at 125-26) Winer subsequently showed the footage to other managers, including Baldwin, Larry Reeder and Eddie Reeder, who helped confirm that the gas was being pumped into Morris's Ford Bronco. (*Id.* at 120; 127)

_____

[1] While Winer only claims to have seen footage of plaintiff filling up a gas can, he testified that plaintiff, after being confronted, admitted to using this gas in his personal vehicle. (D.I. 56 at 126) According to Winer, security camera footage of the employee's parking lot was not available and, therefore, defendant could not independently verify that plaintiff actually deposited gas from that gas canister into his personal vehicle. (*Id.*)

4

On June 17, 2008, Winer claims to have separately confronted both Morris and plaintiff with the video footage. He testified that both admitted to stealing gas, but only that one time. (*Id.* at 133-35) After reprimanding them both, he claims that he sent both employees back to work. (*Id.*)

After sending the men back to work, Winer testified that he reviewed footage from the previous two weeks and found four other occasions in which plaintiff aided Morris in this type of theft. (*Id.* at 119-23) On at least two of those occasions, Winer claims that plaintiff was the one who pumped gas into Morris's truck. (*Id.* at 122) After viewing this, Winer claims that he brought Morris back into his office and showed him video footage of these other, earlier thefts. (*Id.* at 135-36) After Morris acknowledged and apologized for his actions, Winer terminated him. (*Id.* at 136) After terminating Morris, Winer claims that he brought plaintiff back into his office and likewise showed him footage of other instances of theft. (*Id.*) According to Winer, plaintiff admitted to and apologized for aiding Morris and also to taking gas for his own personal use. (*Id.* at 136) Winer then terminated plaintiff as well. (*Id.*) The parties do not dispute that Winer was ultimately responsible for firing plaintiff; however, plaintiff contends that Baldwin was involved in this decision, presumably because he met with Winer to review the footage of the theft and he was also present when the termination occurred. (D.I. 59 at 11; D.I. 54 at 9; 154-78)

Plaintiff testified to a somewhat different version of events. While plaintiff did acknowledge being called into Winer's office and being shown video of the alleged June 16, 2008 theft, he denies having a second meeting or being shown any other

5

footage besides the June 16, 2008 footage of him filling up a gas canister. (D.I. 56 at 75-81) He claims to have been terminated at the end of the first meeting. (Id.) He also denies stealing gasoline or admitting to stealing gasoline. (Id.) Plaintiff contends that he filled up the canister so he could put gas into cars that were being detailed in the shop. (Id.) Defendant does not dispute that detailers were permitted to fill up gas canisters for that purpose. (Id. at 126; D.I. 60 at 74-75) Plaintiff also testified that other employees, including Caucasian salespersons and Baldwin took gasoline for personal use and were not reprimanded in any way for doing so. (D.I. 60 at 40-42)

The video footage of these alleged thefts was not retained by defendant and no longer exists. (Id. at 83) Plaintiff notes that besides him, other individuals saw footage of the alleged June 16, 2008 theft (Winer, the Reeders, Baldwin and Morris) and, as plaintiff notes, their recollections of the video vary to a degree.

After plaintiff and Morris were terminated, defendant hired two men to fill their positions. (D.I. 56 at 223) One man was Caucasian and the other was African-American. (Id.)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that

6

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Title VII Discrimination on the Basis of National Origin and/or Race

#### 1. Standards

Title VII provides, in pertinent part, that it shall be unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

7

employment, because of such individual's race, color, religion, sex, or national origin."
42 U.S.C.A. § 2000e-2.

Both parties acknowledge that plaintiff's Title VII discrimination claim follows the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (D.I. 54 at 8; D.I. 59 at 9) Under this framework, plaintiff must first establish a prima facie case of discrimination. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3rd Cir. 1999); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3rd Cir. 2000). To do this, plaintiff must produce evidence that he: (1) is a member of a protected class; (2) is qualified for his former position; (3) suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when similarly situated non-members of the protected class are treated more favorably than the plaintiff. *Id*; *Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336, 347 (D. Del. 2008). With specific respect to element four, the plaintiff must establish a nexus between his falling within the protected class and his adverse employment decision. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 366 (3rd Cir. 2008). Moreover, element four requires some showing that the ultimate decisionmaker harbored discriminatory animus. *Cannon v. Correctional Med. Servs.*, 726 F. Supp. 2d 380, 392 (D. Del. 2010) (citing *Fuentes v. Perskie*, 32 F.3d 759, 766-67 (3d Cir.1994)). Failure to make out a prima facie case will result in a judgment for the defendant. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352 (3rd Cir. 1999).

8

Assuming a prima facie case has been established, the burden then shifts to defendant to produce "a legitimate, non-discriminatory reason" for the adverse employment action it undertook with respect to the plaintiff. *Jones*, 198 F.3d at 410. A defendant-employer satisfies its burden of production by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763.

If defendant meets its burden of production, the burden shifts back to plaintiff. In order to prevail on the discrimination claim, plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons for the adverse employment action, but were instead a pretext for discrimination. *Jones*, 198 F.3d at 410. At trial, a plaintiff would be required to prove that defendant's reason was false **and** that discrimination was the real reason for the termination. *Fuentes*, 32 F.3d at 763. However, to survive a summary judgment motion in which a legitimate non-discriminatory reason has been proffered, plaintiff is required to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.*; *Jones*, 198 F.3d at 413. The court refers to this two-pronged test as the *Fuentes* test. Under prong one of the

9

*Fuentes* test,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes*, 32 F.3d at 765 (internal quotations and citations omitted). In simpler terms, "a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3rd Cir. 1997)). Generally, cases analyzed under this prong survive summary judgment "when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it." *Connolly v. Pepsi Bottling Group, L.L.C.*, Civ. No. 06-1462, 2008 WL 4412090, at *9 (W.D. Pa. Sept. 22, 2008). Under prong two of the *Fuentes* test, in order to show that a discriminatory reason was more likely than not a motivating or determinative cause of the employer's action, a plaintiff may rely on three types of evidence: (1) previous discrimination against the plaintiff; (2) discrimination by the employer against other persons; and (3) whether an employer has treated other similarly situated employees not within the protected class more favorably. *Id.*; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3rd Cir. 1998).

### 2. Analysis

#### a. The prima facie case

10

In the present case, defendant concedes that elements one, two and three of the prima facie case have been established; it is the fourth element that defendant contests. (D.I. 54 at 9) Specifically, defendant argues that plaintiff "has not adduced sufficient evidence to create an inference that the decision to terminate him was the result of race or national origin discrimination." (Id.) Plaintiff attempts to rebut this argument on three different bases.[2] First, based upon his testimony that Caucasian, non-Jamaican employees filled up their personal vehicles from defendant's gasoline pump without being reprimanded, plaintiff asserts that there is evidence in the record suggesting that similarly situated individuals outside of the protected class were treated more favorably than plaintiff. (D.I. 59 at 11) Second, plaintiff argues that Baldwin, an individual who made remarks about plaintiff's Jamaican heritage, "was involved in the process of terminating [him]." (Id.) Lastly, based upon plaintiff's testimony that Winer made disparaging remarks about Jamaicans, plaintiff claims that he has presented evidence that gives rise to an inference of discriminatory animus on the part of the individual who eventually terminated him. (Id.)

---

[2] Aside from the three arguments addressed below, plaintiff also contends that there are unresolved material issues of fact relating to whether plaintiff actually stole gasoline. The court will not address this argument as the issue before the court is whether the termination was done in a **discriminatory** fashion. Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). As defendant notes, this argument is more appropriately addressed at the pretext stage. (D.I. 61 at 2)

The court will first address these arguments in the context of plaintiff's national origin claim.

Contrary to plaintiff's assertion, similarly situated non-Jamaicans were not treated more favorably than plaintiff. While plaintiff argues that Caucasian salespersons are valid comparators, these individuals hold vastly different, and presumably more senior, positions than plaintiff. To the extent that plaintiff alleges that Baldwin was not terminated for taking gas, Baldwin also holds a superior position to plaintiff. Moreover, this line of argument assumes that defendant was aware that these individuals were "stealing" gasoline; the record, however, does not reflect whether or not defendant knew of these supposed thefts and looked the other way. (D.I. 59 at 11) Most importantly, the record does reflect that Morris, a non-Jamaican detailer who was also accused of theft, was terminated for this alleged theft. In other words, the best comparator available, a non-Jamaican holding the same position as plaintiff, was not treated more favorably; this similarly situated non-Jamaican was treated in the same manner as plaintiff.

With respect to Baldwin being "involved" in the termination decision, "proof of a discriminatory atmosphere may be relevant . . . since such evidence does tend to add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." Ezold v. Wolf, Block, Schorr and Sollis-Cohen, 983 F.2d 509, 546 (3rd Cir. 1993) (internal quotations and citation omitted). However, having acknowledged this, the court concludes that the evidence of record does not support the contention that Baldwin was "involved" in the termination

12

decision. Presumably, plaintiff bases this assertion on the fact that Baldwin reviewed the video footage with Winer and was present when the termination occurred. While this may be true, it does not mean that Baldwin had any say on, or recommendation regarding, the decision to terminate plaintiff. When specifically asked if Baldwin had any input into the termination decision, Winer testified that he did not. (D.I. 56 at 139-40) Winer explained that he brought Baldwin and other managers into his office to "verify" that Morris was pumping gas into his personal vehicle. (*Id.* at 120; 139-40) He also stated that it was standard procedure to have another manager in his office when he reprimanded and/or terminated someone. (*Id.*) Furthermore, Baldwin, during extensive questioning about the events of June 17th, did not testify to having any discussions with Winer regarding the termination decision. (*Id.* at 153-78) Plaintiff has not directed the court to any evidence to the contrary. Thus, on the face of the record, Winer would be considered the sole decisionmaker with respect to plaintiff's termination. Even if Baldwin held a discriminatory attitude toward Jamaicans, plaintiff has identified no evidence suggesting that Baldwin "infected the decisionmaking process." *Creely v. Genesis Health Ventures, Inc.*, 184 Fed. Appx. 197, 200 (3rd Cir. 2006).

Turning to Winer's comment regarding Jamaicans, plaintiff argues that it gives rise to an inference of discriminatory animus on the part of the ultimate decisionmaker. In an attempt to rebut this argument, defendant argues that "[i]t is well-settled that where the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time . . . this fact is evidence of

13

non-discrimination." (D.I. 54 at 11) (citations and quotations omitted) There is an issue of fact in this regard, however, as plaintiff disputes ever being interviewed or officially hired by Winer. Defendant also argues that any inference of national origin discrimination is undermined by the fact that: (1) the alleged comment was nothing more than a stray remark (D.I. 54 at 11) (citing *Ezold*, 983 F.2d at 545; (2) Winer gave plaintiff a pay raise less than a month before the termination occurred; and (3) plaintiff admitted to having a good relationship with Winer.

The court is mindful of the fact that "the **prima facie** requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" *Doe*, 527 F.3d at 365 (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)). Reviewing the evidence in a light most favorable to plaintiff (the nonmoving party), the court concludes that plaintiff has presented sufficient evidence of discriminatory animus on the part of defendant to make out a prima facie case.[3]

Turning to plaintiff's claim of race discrimination, the court finds that plaintiff has failed to meet his burden with respect to element four of his prima facie case. Plaintiff's race-based discrimination claim is premised upon the first two arguments addressed above: (1) the disparate treatment between white and black employees with respect to

---

[3] With specific respect to the stray remarks argument, the court notes that the record does not reflect when Winer's statement was made. The court also notes that in *Ezod*, and other cases cited by plaintiff on this issue, the debate about the weight given to stray remarks occurred during the court's pretext analysis, not the prima facie case stage. Moreover, the cases cited by defendant in its reply brief discuss the probative value of stray remarks in the context of direct proof cases (i.e. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) cases), not under the indirect (i.e. *McDonnell Douglas* ) framework at issue in the present case. (D.I. 61 at 3)

14

the theft of gasoline; and (2) the comments made by Baldwin. For the same reasons discussed above, the court finds those arguments unpersuasive. Moreover, because Winer is not alleged to have made any **racially** discriminatory comments (as opposed to a comment about plaintiff's national origin), plaintiff has provided no evidence to suggest that the individual responsible for his termination discriminated on the basis of race. The court also notes that a race discrimination claim is undermined by the fact that defendant employed several African-Americans while plaintiff was working there and Winer hired an African-American male to fill one of the two open detail positions. (D.I. 56 at 223) For these reasons, the court finds that plaintiff's termination did not occur under circumstances giving rise to an inference of race discrimination.

### b. Pretext[4]

Defendant's legitimate non-discriminatory reason for termination of plaintiff is plaintiff's alleged theft. Plaintiff does not dispute that this is the proffered reason, but does argue that the reason is simply a pretext for discrimination. (D.I. 59 at 12-14) More specifically, plaintiff argues that genuine issues of material fact exist with respect to whether plaintiff actually stole gasoline, particularly in light of the fact that defendant did not preserve the video footage of the alleged theft. (*Id.*) However, with respect to prong one of the *Fuentes* test, plaintiff has not produced evidence which suggests that defendant's reason is "so plainly wrong that it could not have been the employer's real

---

[4] Because the court has found that plaintiff has only set forth a prima facie case on his national origin claim, the plaintiff's race discrimination claim is not addressed in this section; only the national origin claim remains at issue.

15

reason." While plaintiff may deny stealing gasoline and deny admitting to stealing gasoline, at least two people (Winer and Baldwin) have testified that plaintiff did admit as much. The fact that the videotape was not preserved does not make defendant's reason for termination "so implausible that a reasonable fact-finder could not believe it."

With respect to prong two of the *Fuentes* test, plaintiff attempts to show pretext by pointing to evidence that: (1) similarly situated non-Jamaicans were treated more favorably; and (2) he was subject to prior discrimination. For the reasons discussed in section IV.A.2.a, *infra*, the record reflects that non-Jamaicans were not treated more favorably than plaintiff. With respect to evidence of past discrimination, plaintiff relies on the alleged comments made by Baldwin and Winer. In this regard, because the court reviews the evidence in the light most favorable to plaintiff, it is assumed that Baldwin did harass plaintiff by calling him "a Jamaican monkey" and Winer did make the comment that "Jamacia[n] people don't like white people." These instances of alleged discrimination, however, are not sufficient to withstand summary judgment.

The Third Circuit generally considers three factors when determining whether stray remarks are probative of discrimination: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement. These factors must be considered **in toto** in light of the nature and context in which the comment was made." *Connolly*, 2008 WL 4412090 at *11 (citing *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3rd Cir.1997) and *Keller,* 130 F.3d at 1112).

16

As discussed, there is no evidence of record to suggest that Baldwin had any input or say regarding plaintiff's termination; the evidence presented suggests that Winer was solely responsible. With respect to Winer's comment, "stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold*, 983 F.2d at 545. The evidence of record does not suggest that Winer made this comment during the time in which he considered plaintiff's termination. Most significantly, Winer's alleged comment does not facially suggest any bias on his part; instead, he remarks that Jamaicans do not like white people. That statement makes no mention of his personal opinions regarding Jamaican individuals and, thus, provides no insight into the issue at hand, i.e. whether he held any sort of discriminatory animus towards plaintiff.

In summary, the one stray remark by Winer could not reasonably be viewed as sufficient to prove, by a preponderance of the evidence, that plaintiff's Jamaican heritage was a determinative or motivating cause in defendant's decision to terminate. *See Keller,* 130 F.3d at 1112. This is especially true when one reads the record as a whole in light of the weight accorded to stray remarks.[5]

---

[5] The court is cognizant of the fact that, "in indirect proof cases such as this . . . 'remarks unrelated to the employment decision may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent.'" *Staples v. Pepsi-Cola General Bottlers, Inc.,* 312 F.3d 294, 301 (7th Cir. 2002) (quoting *Huff v. UARCO, Inc.,* 122 F.3d 374, 385 (7th Cir.1997)); *see also, Connolly v. Pepsi Bottling Group, L.L.C.,* Civ. No. 06-1462, 2008 WL 4412090 (W.D. Pa. Sept. 22, 2008) (concluding that "stray remarks are insufficient standing alone to defeat summary judgment," and citing Third Circuit cases in support of this proposition). The court, however, did not cite such cases in the body of its opinion because it did not find that Winer's stray remark stood alone; the court acknowledges that his remarks stood alongside Baldwin's allegedly

## B. ADA Claim

### 1. Standards

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). A prima facie case of discrimination under the ADA is established when a plaintiff produces evidence that shows: (1) he is a disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he has suffered an adverse employment decision as a result of discrimination. *Taylor v. Phoenixville School Dist.*, 184 F. 3d 296, 306 (3rd Cir. 1999). The parties acknowledge that plaintiff's ADA claims are also analyzed under the *McDonnell Douglas* burden-shifting framework discussed in section IV.A.1, *infra*. (D.I. 54 at 15; D.I. 60 at 15)

### 2. Analysis

#### a. The prima facie case

In the present case, defendant concedes that elements one and two of the prima facie case have been established; it is the third element that defendant contends has not been met. (D.I. 54 at 15) Plaintiff, in an attempt to rebut this assertion, utilizes the same three arguments set forth above in section IV.A.2.a, *infra*: (1) non-disabled

---

harassing conduct.

employees took company gas without repercussion; (2) Winer made a discriminatory remark about his disability; and (3) Baldwin, who made discriminatory remarks about plaintiff's disability, was involved in the termination decision. (D.I. 59 at 15) Because the court has already engaged in a lengthy analysis of these issues, the court will simply say that for the same reasons discussed in section IV.A.2.a, *infra*, the court finds that plaintiff has established a prima facie case of disability discrimination.

### b. Pretext

As discussed, plaintiff's alleged theft is the proffered non-discriminatory reason for termination. Plaintiff has set forth the same arguments in rebuttal as he did in section IV.A.2.b, *infra* and, for this reason, the court will not engage in a lengthy pretext analysis. The only real difference between these two claims is the alleged comment made by Winer and, therefore, the court will address this issue in some detail.

The discriminatory comment Winer allegedly made was his telling plaintiff to "turn it up, turn it up" (in reference to plaintiff's hearing aid), after Winer said something that plaintiff did not hear. Plaintiff testified that this was the only time Winer commented on his hearing disability. Turning to the three factors addressed when analyzing stray remarks, although Winer was the decisionmaker, there is no indication in the record that this comment was made during or close to the time in which Winer decided to terminate plaintiff. Moreover, Winer asked plaintiff to "turn it up, turn it up" for a legitimate reason. While it may not have been the most considerate way of asking plaintiff to adjust the volume on his hearing aid, the court declines to find that this one stray remark could reasonably be viewed as sufficient to prove, by a preponderance of

19

the evidence, that plaintiff's disability was a determinative or motivating cause in defendant's decision to terminate. Again, this is especially true when one reads the record as a whole, paying particular attention to the weight accorded to stray remarks.

## C. § 1981 Hostile Work Environment Claim

### 1. Standards

The parties agree that a five part test exists with respect to hostile work environment claims brought under § 1981. (D.I. 54 at 15-16; D.I. 59 at 16) Plaintiff must prove that: (1) he suffered intentional harassment based upon his race and/or national origin; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected plaintiff; (4) the harassment would detrimentally affect a reasonable person of the same race and/or national origin in that same position; and (5) the existence of respondeat superior liability. *See McLean v. Commc'n Constr. Group, LLC*, 535 F. Supp. 2d 485, 490 (D. Del. 2008) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3rd Cir. 1990)).[6] A prima facie showing contains both subjective (element three - that plaintiff was in fact affected) and objective (element four - that a reasonable, similarly situated person would be affected) considerations. *Andrews*, 895 F.2d at 1483. As the Supreme Court explained in *Harris v. Forklift Systems, Inc.*, 510

---

[6] The parties also acknowledge that while § 1981 and Title VII are separate and distinct statutes, § 1981 and Title VII hostile work environment claims are analyzed under the same standards. (D.I. 54 at 15; D.I. 59 at 16) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Griffin v. Harrisburg Property Servs., Inc.*, No. 1:CV-08-1655, 2009 WL 4061229, at *4 (M.D. Pa. Nov. 23, 2009) ("The elements of a hostile work environment [claim] are the same under § 1981 as they are under Title VII.") (citation omitted).

U.S. 17, 21-22 (1993), "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."

## 2. Analysis

Defendant concedes that elements one, two and four of the prima facie case have been established; it is the third and fifth elements that defendant contests. (D.I. 54 at 16)

### a. Element three: a detrimental affect on the plaintiff

In an attempt to show that plaintiff was not detrimentally affected by any harassment, defendant emphasizes that plaintiff: (1) did not miss work as a result of the alleged harassment; (2) more than competently performed his job responsibilities, as evidenced by the fact that he received a pay raise less than a month before being terminated; and (3) did not report the alleged harassment to anyone in management. (D.I. 54 at 17) In response, plaintiff notes that he explicitly testified to feeling "uncomfortable" as a result of the harassment and his stress and anxiety regarding the harassment compelled him to have multiple discussions with his co-workers and ex-wife about whether or not he should report Baldwin's conduct. (D.I. 59 at 16-17) Plaintiff also testified that he "got so tired" of the almost daily harassment and found himself avoiding, and unable to communicate with, Baldwin. (D.I. 60 at 31) The fact that

21

plaintiff felt compelled to discuss and consider reporting the harassment evidences

plaintiff's subjective belief that he was working in a hostile and abusive environment.

His taking time out of his day to discuss his anxieties with co-workers and his avoidance

of his direct supervisor are evidence that his work environment was altered based upon

these alleged hostilities. Thus, based upon plaintiff's testimony, the court finds that

plaintiff has met his burden with respect to element number three.

### b. Element five: respondeat superior liability

Hostile work environment claims based upon harassment by a supervisor fall into

two separate categories. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137

(2004). Where harassment culminates in a tangible employment action, such as

discharge, demotion or an undesirable reassignment, an employer will be strictly liable.

*Id.* In other words, element five is a non-issue. Where, however, the harassment is

unaccompanied by a tangible employment action, the defendant-employer may assert

an affirmative defense.[7] *Id.* As the Supreme Court explained in *Pennsylvania State*

_____

[7] The Court explained the need for two separate rules in this way:

> Unlike injuries that could equally be inflicted by a co-worker . . . tangible
> employment actions fall within the special province of the supervisor, who
> has been empowered by the company as an agent to make economic
> decisions affecting other employees under his or her control. The tangible
> employment action . . . is, in essential character, an official act of the
> enterprise, a company act. It is the means by which the supervisor brings
> the official power of the enterprise to bear on subordinates. . . . In sum . .
> . when a supervisor takes a tangible employment action against a
> subordinate it would be implausible to interpret agency principles to allow an
> employer to escape liability.

> When a supervisor's harassment of a subordinate does not culminate in a

22

*Police v. Suders*: "when no tangible employment action is taken . . . [an] employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence: The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [harassment], and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Suders*, 542 U.S. at 137-38 (internal quotations omitted).

Since the supervisory harassment alleged in this case did not result in a tangible employment action, the defendant may and has asserted the above-discussed affirmative defense.[8] In an attempt to establish prong one of the defense, defendant points the court to evidence of its company-wide anti-harassment policy and notes that the existence of such policy "provides 'compelling proof that [defendant] exercised reasonable care in preventing and properly correcting harassment.'" (D.I. 54 at 18) (citing *White v. BFI Waste Services, LLC*, 375 F.3d 288, 299 (4th Cir. 2004)) The problem with this argument is that plaintiff testified that he had never been given or

---

tangible employment action . . . it is less obvious that the agency relation is the driving force. . . . [A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation. But . . . there are acts of harassment a supervisor might commit which might be the same acts a coemployee would commit, and there may be some circumstances where the supervisor's status would make little difference.

*Suders*, 542 U.S. at 144-45 (internal quotations and citations omitted).

[8] Plaintiff acknowledges as much in his brief. (D.I. 59 at 17)

23

seen a copy of this policy.[9]  (D.I. 60 at 50)  Additionally, defendant argues that it has

satisfied prong one based on Winer's testimony that he would immediately terminate

anyone he caught using discriminatory language.  The problem with this argument is

that plaintiff has testified that he believes Winer made insensitive comments about both

his Jamaican heritage and disability.  In light of this, the court concludes that there are

genuine issues of material fact with respect to whether defendant exercised reasonable

care to prevent and promptly correct harassment.

    With respect to prong two, defendant argues that plaintiff's failure to report the

discrimination to anyone in management is proof of plaintiff's unreasonable failure to

take advantage of preventive or corrective opportunities provided by the employer or to

otherwise avoid the harm.  The court finds this argument unpersuasive.  First of all, as

discussed, plaintiff disputes being aware of the company's anti-harassment policy and,

thus, any procedure by which he could and should report allegations of harassment.

Second, plaintiff testified that both his immediate boss (Baldwin) and his boss's boss

(Winer) made discriminatory comments.  While defendant suggests that plaintiff could

have reported the harassment to Mr. Hetrich, the owner of the dealership, the record

does not suggest that plaintiff knew or had any interactions with Mr. Hetrich.  (D.I. 60 at

_____

    [9] While plaintiff's brief also claims that Winer acknowledged that plaintiff's
employee file did not contain a signed document acknowledging receipt of the
company's employee handbook (which contains the anti-harassment policy), that is not
completely accurate.  (D.I. 59 at 17)  In the line of questioning, plaintiff's attorney asks
Winer to assume that his file does not contain a receipt; Winer never admits this to be
the case.  (D.I. 60 at 116)  Plaintiff's brief also directs the court to testimony of Morris in
which he supposedly said that there was no readily identifiable or accessible complaint
system; the cited pages are not, however, provided in plaintiff's brief.  (D.I. 59 at 17-18)

33) Lastly, plaintiff testified to being unsure that anyone would do anything about the harassment and to being afraid he would lose his job if he filed a report, a job he financially needed. According to plaintiff, Baldwin had threatened to have him fired if he spoke up about the harassment. Based upon these alleged facts, viewed in a light most favorable to plaintiff, the record demonstrates that plaintiff's conduct was not unreasonable under the circumstances. While defendant notes that plaintiff is familiar with discrimination procedures, having previously filed claims, this goes to weight and credibility and does not automatically render plaintiff's actions unreasonable.

## V. CONCLUSION

For the reasons discussed above, the court grants defendant's motion for summary judgment in part and denies in part. An appropriate order shall issue.